# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 11-CV-3030 (JFB)

———————————

## JOHN DALY,

Petitioner,

VERSUS

## WILLIAM LEE, SUPERINTENDENT GREEN HAVEN CORRECTIONAL FACILITY,

Respondent.

———————————

**MEMORANDUM AND ORDER**
April 4, 2014

———————————

JOSEPH F. BIANCO, District Judge:

John P. Daly ("petitioner" or "Daly") petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction entered on June 11, 2002 in the County Court of the State of New York, County of Nassau, for six counts of robbery in the first degree, N.Y. Penal Law § 160.15(1)-(2); two counts of assault in the first degree, *id.* § 120.10(1); and two counts of attempted robbery in the first degree, *id.* § 110 160.15(1)-(2). Petitioner was sentenced to a term of imprisonment of thirty-five years, which was subsequently reduced to twenty-five years.

Petitioner challenges his conviction on the following grounds: (1) ineffective assistance of counsel; and (2) his constitutional rights were violated because of "prejudicial spillover" when he was tried simultaneously for two robberies, one at an Off Track Betting parlor ("OTB") in Farmingdale, New York, and the other at a Mobil gas station in Hempstead, New York, where the OTB robbery conviction was later vacated. For the following reasons, the Court denies the petition for writ of habeas corpus in its entirety on the merits.

## I. BACKGROUND

### A. Factual Background

The Court has adduced the following facts from the instant petition and underlying record. This case concerns two separate crimes that were tried together against petitioner.

#### 1. OTB Robbery and Shooting

The first incident occurred on January 14, 2001, at the Off Track Betting ("OTB") in Farmingdale, New York, on Hempstead Turnpike. (Tr.[1] at 5). Throughout the afternoon, several individuals observed a "very suspicious" and "odd-looking" man in the OTB. (*Id.* at 255-60, 265-67, 323-25, 349-50, 516-20.) The man was a White male, about thirty to forty years old, with an approximate height of six feet and weight of

———————————

[1] "Tr." refers to the transcript of petitioner's trial.

190 pounds. (*Id.* at 258, 324, 341, 349-50.) He had a mustache and was wearing a blond shoulder-length wig, dark baseball cap, lightly tinted sunglasses, scarf, and large ski jacket. (*Id.* at 258-59, 323-25, 340-41, 349-51.)

At about 1:00 p.m., the OTB operations manager, Glen Abraham ("Abraham"), took special notice of the man because he was an "odd-looking character." (*Id.* at 349-52.) Abraham watched him sporadically throughout the day, observing that the man wore his sunglasses most of the time while checking the results and watching the races. (*Id.* at 349-50.) Abraham later identified petitioner as this man. (*Id.* at 359-62.) Around 2:00 p.m., Peter Shank ("Shank") entered the OTB and began watching the races on the televisions in the back of the room. (*Id.* at 255-57.) After about five minutes, Shank noticed the same man, whom he described as "very suspicious," wearing sunglasses about three feet away from him. (*Id.* at 257-60.) Shank began watching the races and placing bets while continuing to look over at the man, who stood about twenty feet away and never left the area where the results were posted. (*Id.* at 260-61.) Shank identified petitioner as this man. (*Id.* at 264-65, 285-91.)

Around 4:20 p.m., the ninth race had just closed and three cashiers—Catherine Koscik ("Koscik"), Georgeann Bragman ("Bragman"), and Carol Corrado ("Corrado")—were working at different windows. (*Id.* at 337-38, 513-15, 320-22.) Abraham was in the back room doing paperwork, and all of the customers were watching the race. (*Id.* at 355, 338.) The man approached Koscik's window, pointed a silver revolver at her face, and said, "Give me your large bills." (*Id.* at 338-40, 518.) Koscik grabbed a pack of large bills and threw it into the man's knapsack. (*Id.* at 340.) When the man moved to Bragman's window, Koscik ran into the back room and screamed, "We're being robbed. We're being robbed." (*Id.* at 341-42.)

The man approached Bragman's window and pointed his gun at her. (*Id.* at 518.) Having just witnessed the man rob Koscik, Bragman knew what he wanted and had her money ready. (*Id.*) She placed about $2200 in his knapsack, and the man walked over to Corrado's window. (*Id.* at 519.) The man then robbed Corrado in the same manner. (*Id.* at 325-27, 519.)

At about 4:00 p.m., Shank witnessed two fearful-looking cashiers placing money in a robber's bag. (*Id.* at 265-66.) He deduced that a robbery was in progress and ran towards the robber, who was walking toward the exit. (*Id.* at 267.) Shank tackled the robber near the door and landed on top of him. (*Id.* at 268-69.) As Shank stood and went to pick the man up off the floor, he heard a shot. (*Id.*) He felt a burning sensation in his stomach, realized he had been shot, and fell to the ground. (*Id.*) The robber then ran out of an emergency exit door. (*Id.* at 270.) Bragman called the police after witnessing Shank tackle the man and hearing a gunshot. (*Id.* at 520.) The police arrived a few minutes later and began securing the crime scene. (*Id.* at 358.) Shank was airlifted to a hospital, where he underwent surgery to repair his bullet-damaged liver. (*Id.* at 272-73.)

At around 7:15 p.m., Detective Patrick Carroll ("Detective Carroll") entered the OTB and observed a pool of blood on the floor, a bullet hole in a wood partition, and a bullet lying on the floor. (*Id.* at 302-05.) The bullet was a damaged lead fragment from a revolver which was deformed from either going through or hitting a hard object. (*Id.* at 311-12.) In the OTB parking lot, Detective Carroll found a dark-colored baseball cap with an Abercrombie and Fitch logo. (*Id.* at

310.) When presented with the baseball cap in court, neither Shank nor Abraham could positively identify the cap as the one worn by the OTB robber. (*Id.* at 263, 351.)

### 2. Mobil Station Attempted Robbery and Shooting

The second incident occurred on February 26, 2001, at the Mobil Gas Station at 710 Fulton Avenue in Hempstead. (*Id.* at 427-30.) At about 10:20 a.m., Liquat Ali ("Ali") was at work pumping gas while Harbans Bharaj Sr., ("Bharaj Sr."), the gas station owner, and Harbans Bharaj Jr. ("Bharaj Jr."), his son, were counting money inside the office. (*Id.* at 427-29, 390.) When Ali opened the door to walk inside the station, a man grabbed him by his shirt from behind. (*Id.* at 429.) The man held a silver revolver to Ali's shoulder and demanded that Ali go in the station and give him "whatever was inside." (*Id.* at 429-31.) The man was of average size, about 5'9" or 5'10," and had fair skin. (*Id.* at 392, 431.) He was wearing a dark ski hat pulled over his face with an opening that revealed his eyes, nose and lips. (*Id.* at 431-32, 486, 392-94.) He was also wearing a black and red plaid shirt and cut-off gloves that revealed his fingers. (*Id.* at 431, 486.) Ali identified petitioner as this man. (*Id.* at 434-35.)

Ali had seen petitioner at the Mobil on four or five different occasions about two weeks before the incident. (*Id.* at 436-37.) On two of these occasions, petitioner gave Ali an Exxon credit card and told him to swipe the card and give him $20 in cash instead of pumping gas. (*Id.* at 437.) On both of these occasions, petitioner never received any money for his attempted transactions because his credit card was not approved. (*Id.*) On another occasion, petitioner came to the gas station and asked customers if he could use his credit card to pay for their gas in exchange for cash. (*Id.*)

On multiple visits to the Mobil, Ali had observed petitioner driving a large white pickup truck with blue lettering, and later identified a photograph of the truck. (*Id.* at 437-38.)

Bharaj Sr. and Bharaj Jr. were sitting in the office of the gas station when they heard Ali scream. (*Id.* at 392, 484, 490.) They ran out of the office and saw petitioner pushing Ali through the gas station door. (*Id.* at 392, 484-86.) Ali was yelling, "Help, help, he's robbing me, help." (*Id.* at 484.) Bharaj Sr. immediately recognized petitioner as the same customer who had visited the station on multiple prior occasions. (*Id.* at 490.) On the first occasion, two weeks prior to the attempted robbery, Bharaj Sr. witnessed petitioner arrive at the station driving a white pickup truck with blue lettering and New Jersey license plates. (*Id.* at 487-88.) Petitioner attempted to use his company credit card to pump gas for other customers in exchange for their cash. (*Id.* at 487.) On the second occasion, petitioner attempted to use his credit card again to pay for gas but the card would not work. (*Id.* at 488.) On the third occasion, Bharaj Sr. saw petitioner arrive at the station on a bicycle, which he dropped in front of the door before entering the sales area. (*Id.* at 489.) Petitioner was hostile toward Bharaj Jr. as he bought cigarettes and, at one point, petitioner threatened to kill him. (*Id.* at 489-90, 397-98.) Shortly after threatening Bharaj Jr., petitioner then left the gas station on his bicycle. (*Id.* at 398.)

After leaving the office and seeing petitioner and Ali in the sales area, Bharaj Jr. panicked when he realized that a robbery was in progress and threw a piece of L-shaped countertop at petitioner. (*Id.* at 392, 394-95, 417.) Petitioner then abandoned his robbery plans and started running away toward Cameron Avenue. (*Id.* at 392-93, 490-92.) Bharaj Sr. and Jr. began pursuing

petitioner. (*Id.* at 393, 435, 490-91.) As he approached the corner of the gas station, he turned to look toward the Bharajs and then headed down Cameron Avenue. (*Id.* at 491.) About fifty feet further, petitioner turned around a second time. (*Id.*) Bharaj Sr. then saw that petitioner was holding a gun and screamed to warn his son, "Run, he's got a gun." (*Id.* at 393, 491-92.) Bharaj Jr., who was about ten feet away from petitioner, saw a silver revolver in petitioner's hand. (*Id.* at 400-01.) Petitioner then turned toward the Bharajs and fired. (*Id.* at 400, 491-92.) The bullet hit Bharaj Jr. in his finger, continued into his abdomen, and became lodged near his spine. (*Id.* at 402-05.)

After firing his gun, petitioner proceeded down Cameron Avenue and turned right onto Devon Street. (*Id.* at 402-03.) At about 10:20 a.m., Clarence Jackson ("Jackson"), a resident of Cameron Avenue, heard gunshots from outside his home. (*Id.* at 702-05.) He looked out the window and saw a man in a red plaid jacket running across Cameron Avenue. (*Id.* at 705-06.) He also witnessed the man get into a small white car on the corner of Devon Street and Cameron Avenue and drive away. (*Id.*)

Bharaj Sr. stopped chasing petitioner when his son was shot and called 911 for help. (*Id.* at 403, 492.) Bharaj Jr. was transported to a hospital where he underwent abdominal surgery. (*Id.* at 492-93, 403-05.) He was hospitalized for four days and returned to the hospital for a second surgery to remove the bullet. (*Id.* at 405-06.)

### 3. Police Surveillance of Petitioner's House

On February 26, 2001, the morning of the Mobil incident, Detectives Robert Ragona ("Detective Ragona") and Douglas Sorenson ("Detective Sorenson") were conducting surveillance near petitioner's home in Levittown. (*Id.* at 451-52, 472-73.)

At about 9:00 a.m., they parked by the house in an unmarked vehicle. (*Id.* at 473-74.) There was a white Nissan pickup truck with blue writing on the sides parked in the driveway. (*Id.* at 454, 474.) At about 10:10 a.m., a male tenant driving a red van pulled up to the front of the residence and entered the house. (*Id.* at 474-75.) The tenant was not carrying anything. (*Id.* at 456, 475.)

At about 10:50 a.m., the detectives saw petitioner pull into the driveway in a white Nissan Pulsar. (*Id.* at 456-59.) Petitioner got out of the car and was holding a small bag against his waist. (*Id.* at 458-59.) When petitioner entered the driveway, the tenant exited the house and the two men spoke briefly before going inside the house. (*Id.* at 458-60, 477.) At sometime between 11:15 a.m. and 11:50 a.m.,[2] the tenant left the house in a red van. (*Id.* at 461.) After that time, no one other than petitioner entered or exited the house. (*Id.* at 460, 562-63, 647.)

At about 1:00 p.m., Detectives Ragona and Sorenson were relieved of their surveillance duties by Detectives Edward Byrnes ("Detective Byrnes") and Thomas Washington ("Detective Washington"), who continued the surveillance. (*Id.* at 461, 478-79, 559-60, 643-45.) Around 6:30 p.m., petitioner was arrested by members of the Special Operations Unit. (*Id.* at 563-64.) Detectives Ragona and Byrnes drove petitioner to the Robbery Squad office. (*Id.* at 564-65.)

### 4. Petitioner's Statements to the Police

At about 6:45 p.m., Detective Byrnes placed petitioner in an interview room at the Robbery Squad office, where they were joined by Detective Washington. (*Id.* at 566-

---

[2] Detective Sorenson testified that the tenant left the house at about 11:15 to 11:20 a.m. (Tr. at 461.) Detective Ragona testified that the tenant left the house at about 11:50 a.m. (Tr. at 478.)

68, 650.) After he was advised of his rights, petitioner agreed to talk to the police and stated, "I don't need a lawyer. I didn't do anything." (*Id.* at 568-69, 651.) Petitioner authorized a search of his house by signing a consent form. (*Id.* at 573, 653.) He denied any involvement in or knowledge of the Mobil incident, claiming that he had stayed at a motel the night before until about 11:00 a.m. (*Id.* at 574, 653-54.) Detective Byrnes noted several lies and inconsistencies in petitioner's statements concerning his whereabouts the prior week, his activity on the morning of the Mobil incident, and whether he had ever been to the OTB. (*Id.* at 578-81, 655-56.) When the detectives pointed out these inconsistencies, petitioner indicated that he no longer wished to talk and ended his interview. (*Id.* at 581, 657.)

### 5. Incriminating Evidence Recovered from Petitioner's Home

Immediately after petitioner's arrest, Detectives Robert Hillman ("Detective Hillman") and Stephen Kowalski ("Detective Kowalski") entered petitioner's home with the consent of his wife, Nancy Daly. (*Id.* at 525, 544.) Mrs. Daly retrieved two handguns from the bedroom and handed them to the detectives along with their carrying case. (*Id.* at 525-26, 543-45.) One of the handguns was a .38 caliber silver revolver. (*Id.* at 526, 545-46.) The detectives brought the guns to the Robbery Squad where they were invoiced for testing at the Scientific Investigation Bureau ("SIB") Firearms Section. (*Id.* at 528, 546.)

The following morning at about 4:40 a.m., Hillman and Kowalski returned to petitioner's home to execute a search warrant. (*Id.* at 529, 546.) During the search, they recovered a red and black plaid flannel jacket in an upstairs bedroom. (*Id.* at 529-30, 546-47.) The jacket was rolled into a ball and inside of it was a blue ski hat with a hole cut out of the face area. (*Id.* at 530-31, 547-48.) These two items were invoiced and sent to SIB for further evaluation. (*Id.* at 548-49.) At trial, Bharaj Jr. identified the jacket and hat recovered from petitioner's house as the same garments worn by the man who shot him near the Mobil station. (*Id.* at 407-08.)

### 6. Petitioner's Identification by the OTB Witnesses

On March 29, 2001, Abraham and Shank independently identified petitioner as the OTB robber from a lineup at the Nassau County Police Department Robbery Squad. (*Id.* at 359-62, 285-91.) Prior to viewing the lineup, neither man discussed the case with anyone else in the waiting area. (*Id.* at 360, 287-88.) After the identification, neither man had any contact with the other witnesses, who had not yet viewed the lineup. (*Id.* at 362, 291-92.)

### 7. Petitioner's Identification by the Mobil Station Witnesses

On March 29, 2001, Bharaj Jr.[3] and Ali separately identified petitioner as the Mobil station robber at the Robbery Squad. (*Id.* at 411-17, 441-43.) They did not discuss the case with anyone else at any time prior or subsequent to viewing the lineup. (*Id.* at 413-16, 440-43, 642-43.)

---

[3] Petitioner argues that Bharaj Jr. did not indicate any recognition of the Mobil robber as a familiar customer until the "suggestive line-up procedures" (Pet. Br. at 4), pointing to Bharaj Jr.'s testimony that after the Mobil robber began running away, he and his father "decided that, oh, maybe it's some local thug, so let's, you know, let's get him." (Tr. at 400). This assertion is not supported by the record, which shows that the line-up procedures were not suggestive and indicates that Bharaj Jr. recognized petitioner as the robber when he testified that he saw the robber's face and said, "This is the same customer. He's been here a few times." (Tr. at 490.)

### 8. Evidence Connecting Petitioner to Both Crimes

On February 27, 2001, Detective Robert Nemeth ("Detective Nemeth") received the two handguns, magazines and ammunition given to the police by petitioner's wife. (*Id.* at 715.) He also received the .38 caliber lead bullet recovered from the OTB on January 14, 2001. (*Id.* at 715-16.) Detective Nemeth compared the "lands and grooves"[4] of the OTB bullet to the "lands and grooves" of petitioner's revolver. (*Id.* at 714, 720-21.) He concluded that it was "probable," but not certain, that the bullet was fired from petitioner's revolver. (*Id.* at 721.)

On March 15, 2001, Detective Nemeth received the copper-jacketed bullet removed from Bharaj Jr.'s body during surgery. (*Id.* at 716-17.) He analyzed the "lands and grooves" of this bullet and compared them to bullets that were test-fired from petitioner's revolver. (*Id.* at 720-21.) Nemeth concluded that, to a reasonable degree of scientific certainty, the bullet recovered from Bharaj Jr.'s body was fired from petitioner's revolver. (*Id.* at 722.)

### 9. DNA Evidence

On March 6, 2001, Detective Vito Schiraldi ("Detective Schiraldi") from SIB received the plaid flannel jacket and the ski mask recovered from petitioner's home. (*Id.* at 617, 622-23). DNA testing on the ski mask established that the mask contained petitioner's DNA. (*Id.* at 624-28, 696-97.)

On March 1, 2001, Detective Schiraldi received the dark Abercrombie and Fitch baseball hat that was found in the OTB

parking lot. (*Id.* at 620-21.) There were four human hairs in the hat, upon which Schiraldi performed DNA testing. (*Id.* at 622, 626-27.) The results of the DNA testing indicated that these hairs from the Abercrombie and Fitch baseball hat did not originate from John Daly. (*Id.* at 628.)

### 10. Keiran Ryan

During the course of his investigation, Detective Kowalski interviewed Kieran Ryan ("Ryan"), who was 5'8" tall and weighed 180 pounds. (*Id.* at 552-53.) Kowalski had eliminated Ryan as a suspect in the January 14, 2001 OTB robbery when he learned that Ryan had been discharged from a hospital on January 13, 2001 with his right arm in a cast and sling. (*Id.* at 555-56.) The date of the OTB robbery was January 14, 2001, and the OTB robber was never described as wearing a cast or sling. (Tr. at 555-56, 258-59, 323-25, 340-41, 349-51.)

### 11. Petitioner's Case

Petitioner testified that, in early 2001, he was 43 years old and lived in a house in Levittown, New York with his wife, Nancy Daly, and his friend, Jerry Rooney ("Rooney"). (*Id.* at 728-29, 744.) He admitted to using crack and cocaine, as well as entering a rehabilitation program to save his marriage. (*Id.* at 779-82.)

Petitioner claimed that he weighed 215 pounds at the time of his trial and about 225 pounds at the time of his arrest. (*Id.* at 729-30.) He also claimed that he had not weighed 190 pounds since high school and that he was 5'9" tall. (*Id.* at 730, 814.) Petitioner denied telling the police and the jail on January 27, 2001, that he weighed about 190 pounds and was 5'10" tall. (*Id.* at 730, 769-70.) However, Detective Byrnes testified that on February 26, 2001, petitioner told him that he was 5'10" and weighed 190 pounds. (*Id.* at 868-69.)

---

[4] "Lands and grooves" are rifling characteristics. As explained by Detective Nemeth, "a rifling is a cutting of a groove or several grooves in the barrel. It is cut in order to impart a twist which stabilizes the bullet in flight." (Tr. at 714.)

Corporal Keith Knight of the Nassau County Correctional Center testified that all inmates are measured for their height and weight upon admission to the facility. (*Id*. at 845-47.) On February 27, 2001, petitioner was measured at 5'10" and 192 pounds, and this information was recorded in the jail's computer system and is reproduced in Respondent's Exhibit 47. (*Id*. at 852.)

According to petitioner, on January 11, 2001, he was laid off from his job and he fought with his wife about his unemployment. (*Id*. at 737.) On January 13, 2001, he spent the night at his father's house and did not leave until after lunch the next day—the day of the OTB robbery. (*Id*.) Petitioner claimed that he went to Home Depot in Hempstead at 2:00 p.m., went back to his house, and then returned to Home Depot again around 4:30 p.m. (*Id*. at 737-38.) He produced two receipts from Home Depot dated January 14, 2001, at 2:08 p.m. and 4:43 p.m., in the amounts of $50 each. (*Id*. at 740.) Petitioner testified that the only time he had ever been to the Farmingdale OTB was in November 2000. (*Id*. at 736-37.) He also claimed that he was mistaken when he told the detectives that he had been to the OTB in January 2001. (*Id*. at 736.)

Petitioner testified that on the night of February 25, 2001, he stayed at the Courtesy Motel in Hempstead. (*Id*. at 760.) He claimed that he drove there in his company's white pickup truck. (*Id*. at 761.) He asserted that he "w[as]n't desperate for cash" because he had recently received a severance check for $4,300 from his former employer. (*Id*. at 754, 787.) However, he admitted to using a credit card that same night to purchase a $100 gift card from Home Depot and immediately making a 98 cent purchase solely to get the balance of the gift card in cash. (*Id*. at 786-87.) Petitioner claimed that he used the cash to pay for his hotel room because the hotel would not

accept credit cards. (*Id*. at 788.) However, that claim was proven false by a receipt indicating that he used a credit card to check in to the Courtesy Motel at 12:23 a.m. on February 26, 2001. (*Id*. at 788-89.)

Petitioner testified that he left the hotel the next morning and returned to his home at 7:00 a.m. (*Id*. at 761.) He claimed that he took Rooney's red van at 9:00 a.m. to unload boiler equipment at K-Mart and then returned to his house at 9:45 a.m. (*Id*. at 763-64.) Petitioner contended that Rooney pulled up to his house in petitioner's white Pulsar around 10:00 a.m. and that he went outside to speak to Rooney in the driveway. (*Id*. at 764.) Petitioner claimed that he went back into his house and remained there for the rest of the day until the time of his arrest. (*Id*. at 764-65.)

Petitioner denied any involvement in both the OTB and Mobil incidents. (*Id*. at 765.) He admitted that he had been to the Hempstead Mobil at least five or ten times and that his credit card had been rejected there on one occasion. (*Id*. at 754-55.) He also recognized Ali. (*Id*. at 756.) Petitioner admitted that he owned the gun that was used to shoot Bharaj Jr. and that this gun was kept in his bedroom closet. (*Id*. at 806-07.) He also admitted that he owned gloves with cut-out fingers and that the police removed such gloves from his home while executing a search warrant. (*Id*. at 807-10.) He denied that he ever rode to the Mobil station on a bicycle or bought cigarettes there. (*Id*. at 755-56.)

Petitioner admitted that he owned the knit ski hat with the large hole cut out in the front. (*Id*. at 744.) However, he claimed that there had only been a small one-inch tear in the hat that one of his dogs made. (*Id*. at 744-45.) He asserted that the hole, as it appeared in court, was larger than that made

by his dog and that he had never seen his hat with such a large hole in it. (*Id.*)

Petitioner believed that Rooney robbed the Mobil station. (*Id.* at 772-73.) He stated that Rooney owned flannel shirts similar to the red and black flannel shirt that the police recovered from petitioner's house. (*Id.* at 745.) Petitioner claimed that he does not own any flannel shirts like the one that the police recovered. (*Id.*) He stated that Rooney had "free run" of the house and that he had access to the upstairs bedroom where the flannel shirt, knit hat and cut-off gloves were found. (*Id.* at 747-48.) Petitioner also stated that he never had any contact with Rooney after his own arrest. (*Id.* at 815.)

Petitioner claimed that he never told the detectives that he checked out of the Courtesy Motel at 11:00 a.m. (*Id.* at 792-93.) He stated that the time at which he checked out had never been discussed during his interview. (*Id.* at 793.) He also denied telling detectives that he took his wife's Pulsar out for a test drive. (*Id.* at 795.) During his interview with the detectives, petitioner never once mentioned Rooney or the fact that Rooney was driving the Pulsar on the day of the Mobil incident. (*Id.* at 795-98.) He claimed that he ended the conversation with the detectives because he believed that the written statement the police asked him to sign was inaccurate. (*Id.* at 757-59.)

Petitioner's father, John Daly Sr. ("Daly Sr."), testified that his son asked him to cash a $4300 severance check on February 17, 2001. (*Id.* at 830-31.) Petitioner accompanied his father to the bank, where he cashed the check and gave petitioner $2300. (*Id.* at 831.) Daly Sr. held the remaining $2000 for petitioner's wife. (*Id.* at 831-32.) Daly Sr. also stated that between June 2000 and February 2001, petitioner stayed at his father's house several nights per week. (*Id.* at 832.) Nancy Daly's nephew, Todd Smith, testified that he had been to petitioner's home nearly every day since February 26, 2001, and had never seen Rooney at the house. (*Id.* at 838-40.)

B.    Procedural History

1.    County Court Proceedings

a.    Pre-trial Suppression Hearing

On December 10 and 11, 2001, a combined *Huntley*, *Mapp*, and *Wade* hearing was conducted before the Honorable Donald DeRiggi in the Nassau County Court. (Resp. Ex.[5] 64 at 1.) The hearing was held to determine petitioner's motion to suppress his statements to the investigating detectives, identification testimony and physical evidence. (Resp. Ex. 62 at 2.) On February 14, 2002, the County Court denied the suppression motion in its entirety. (*Id.* at 20, Resp. Ex. 63 at A-1089.) The court held: (1) petitioner's wife voluntarily agreed to turn over the guns to the police; (2) the photo array shown to eyewitnesses was not unduly suggestive; (3) the police had probable cause to arrest petitioner; and (4) petitioner knowingly, intelligently and voluntarily waived his *Miranda* rights. (Resp. Ex. 62 at 20-21, Resp. Ex. 63 at A-1086-89.)

Petitioner's counsel sought reargument, which was denied. (Resp. Ex. 62 at 21.) However, on June 3, 2002, the County Court issued an amended decision. (*Id.* at 21, Resp. Ex. 63 at A-1090-91.) The amended decision was identical to the original February 2002 decision, except it added a ruling that "the lineup was conducted in a manner which did not violate the defendant's constitutional right[s]. . . ." because it was not suggestive and the police

---

[5] "Resp. Ex." refers to exhibits submitted with respondent's opposition to the habeas corpus petition.

did nothing to direct the witness's attention to petitioner. (*Id.*)

### b. Indictment and Conviction

On July 16, 2001, petitioner was indicted for six counts of robbery in the first degree, three in violation of N.Y. Penal Law § 160.15(1) and three in violation of Penal Law § 160.15(2). (Resp. Ex. 1.) Petitioner was also indicted for two counts of attempted murder in the first degree, in violation of N.Y. Penal Law § 110.00 of 125.27, Subdivision (1)(a)(vii); two counts of assault in the first degree, in violation of N.Y. Penal Law § 120.10(1); and two counts of attempted robbery in the first degree, in violation of N.Y. Penal Law § 110.00 of 160.15, Subdivisions 1 and 2. (*Id.*)

On June 11, 2002, the jury found petitioner guilty of six counts of robbery in the first degree,[6] two counts of assault in the first degree (one for each shooting victim), and two counts of attempted robbery in the first degree.[7] (Tr. at 1059, 1073-74.) Petitioner was found not guilty of the two counts of attempted murder. (*Id.*)

### c. Motion to Set Aside the Verdict

Prior to sentencing, petitioner retained new counsel, Thomas Liotti ("Liotti"), and moved to set aside the verdict under N.Y. C.P.L. § 330.30 on the ground that the trial counsel, Ernest Peace ("Peace"), failed to provide effective assistance of counsel. (Resp. Ex. 2 at ¶¶ 1-14.) In his motion, Liotti stated that he was "shocked and appalled by Mr. Peace's conduct" and that Peace "exhibited an ineptitude in this case that is literally unrivaled by any[thing] I have previously reviewed." (*Id.* at ¶¶ 3, 6.)

Liotti remarked that Peace was "a legal dinosaur, loose in the Jurassic Park of our courtrooms . . . with flourishes of synergy akin to a type of senile dementia." (*Id.* at ¶ 11.) Liotti also asserted that "but for [Peace's] conduct, Mr. Daly would have been found innocent of these charges." (*Id.* at ¶¶ 4.) Petitioner also included an affidavit from Nancy Daly in support of the motion. (*Id.* at 1.) Mrs. Daly opined on the many ways she felt that Peace was ineffective, including his refusal to do a writ for a bail reduction, his decision to waive petitioner's speedy trial rights without his knowledge, and his failure to ask for a subpoena for the videotape of the OTB. (*Id.* at 1-2.)

The People opposed, and Peace submitted an affirmation ("Peace's affirmation") in which he detailed his entire trial strategy. (Resp. Ex. 6.) He stated that there was an abundance of communication between him and petitioner, including at least 39 visits at the jail, and "dozens" of meetings with petitioner's wife and father. (*Id.* at ¶ 37.) Peace stated that that he did not use the alibi witnesses because they would conflict with the defense. (*Id.* at ¶ 29.) He also stated that, in a post-verdict discussion with the jurors, he was told that petitioner's own inconsistent testimony about his weight led several jurors to find him guilty when they were otherwise convinced of his innocence. (*Id.* at ¶ 45.) Peace also stated that Liotti's insults were "vicious and inappropriate" personal attacks and that Liotti "makes suggestions which no honest attorney would ever make." (*Id.* at ¶¶ 5, 6.)

On November 15, 2002, the court denied petitioner's motion to set aside the verdict. (Resp. Ex. 7.) The court found that petitioner was "afforded meaningful representation at his trial" and that Peace presented petitioner's defense in a "coherent and consistent manner." (*Id.* at 8.) The court also noted that Liotti's language was

---

[6] The two counts of robbery, under different theories, were charged for each of the three OTB cashiers.

[7] The two counts of attempted robbery were charged under different theories for the Mobil incident.

"inappropriate and abusive" and that his conduct was "unacceptable." (*Id.*)

### d. Sentencing

On January 6, 2003, petitioner was sentenced to concurrent determinate terms of imprisonment of fifteen years on each count of robbery in the first degree and on one count of assault in the first degree. (S[8] at 13.) The court also imposed concurrent determinate terms of twenty years' imprisonment for the remaining count of assault in the first degree and the two counts of attempted robbery in the first degree. (*Id.*) The twenty-year terms were directed to run consecutively to the fifteen-year terms. (*Id.*) The total sentence amounted to a term of thirty-five years. (*Id.*) On February 4, 2003, the court, on its own motion, reduced the term of imprisonment imposed on the attempted first-degree robbery counts to fifteen years. (Resp. Ex. 63 at A-1127.) In all other respects, the sentence remained unchanged. (*Id.*)

### e. Petitioner's First § 440.10 Motion

On September 23, 2003, petitioner sought an order, pursuant to C.P.L. § 440.10, to vacate the judgment of conviction on the following grounds: (1) ineffective assistance of trial counsel; (2) newly discovered evidence; and (3) the prosecutor's failure to provide testimony concerning alleged *Brady* material. (Resp. Ex. 13.) The *Brady* violation concerned a baseball cap recovered from the OTB parking lot that did not contain petitioner's DNA. (*Id.* at 7-8.) Petitioner also made note of his continuing application for an order of recusal for this motion. (*Id.* at 1.) On March 29, 2004, the County Court of Nassau County (Brown, J.) denied petitioner's § 440.10 motion. (Resp. Ex. 16.) The court

held that "defense counsel's actions were within the reasonable objective range of performance and he provided the defendant with meaningful representation." (*Id.* at 9.)

### f. Appeal to the Appellate Division

On July 21, 2004, petitioner appealed his conviction to the Appellate Division, Second Department. (Resp. Ex. 21.) He raised the following claims: (1) trial counsel was ineffective; (2) the evidence was legally insufficient to establish guilt; (3) the trial judge should have recused himself; (4) the court failed to take into account petitioner's pre-sentence memorandum challenging the findings and conclusions of the probation department and did not afford petitioner a hearing wherein he could contest hearsay allegations in the report; and (5) petitioner's sentence was excessive. (Resp. Ex. 21.)

On July 18, 2005, the Appellate Division issued an order reducing the determinate terms of imprisonment imposed on each count to twelve and one-half years of imprisonment as a matter of discretion in the interest of justice. *People v. Daly*, 20 A.D.3d 542 (N.Y. App. Div. 2005). The court otherwise affirmed the conviction, holding that "defendant was afforded effective assistance of counsel. . . . The defense counsel presented a coherent, cogent defense." *Id.* at 543. The court also held: (1) the evidence was legally sufficient to establish petitioner's guilt; (2) the verdict was supported by the weight of the evidence; (3) the judge properly declined to recuse himself; (4) the reduction of the terms of imprisonment from thirty-five years to twenty-five years was a more appropriate sentence; and (5) the remaining contentions were without merit. *Id.* at 543-44.

### g. Petitioner's Second § 440.10 Motion

On December 19, 2005, petitioner brought a second C.P.L. § 440.10 motion

---

[8] "S" refers to petitioner's sentencing hearing.

based upon the disclosure of documents that petitioner had requested on April 2004 from the Nassau County Police Department pursuant to New York's Freedom of Information law (New York Public Officers Law § 84, et seq.). (Resp. Ex. 33.) Petitioner claimed he was denied a fair trial because the People failed to turn over certain witness statements to which he was entitled under *People v. Rosario*, 9 N.Y.2d 286 (1961), or *Brady v. Maryland*, 373 U.S. 83 (1963). (Resp. Ex. 33 at 1.) These documents consisted of, *inter alia*, witness statements relating exclusively to the OTB incident, including notes from a detective's hospital interview with Shank, the OTB shooting victim, and a written statement from Terry Rogers ("Rogers"), a witness who saw the OTB perpetrator without his disguise in his black Cougar. (*Id.* at 6-9.) Rogers did not testify at the criminal trial and was not called as a witness. (*Id.* at 3.) Both Shank and Rogers described the OTB perpetrator as a dark-looking Italian male in his 20s, which was inconsistent with petitioner's appearance. (*Id.*) Petitioner believed that this evidence would have exonerated him because "this case was based solely on identification." (*Id.* at 1.) None of these witnesses or their witness statements were in any way related to the February 26, 2001 Mobil incident. (Resp. Ex. 50 at 26-36.)

On December 21, 2006, the court denied petitioner's second § 440.10 motion. (Resp. Ex. 43.) The court concluded that the non-disclosure of certain evidence with which the defense should have been provided did not prejudice petitioner. (*Id.*) The court also concluded that petitioner failed to establish that his trial counsel was ineffective. (*Id.*)

h.  Appeal of the Second § 440.10 Decision

On February 1, 2008, appealed the denial of his second § 440.10 motion. (Resp.

Ex. 48.) Petitioner raised the following claims: (1) the County Court, finding that *Brady* and *Rosario* violations had occurred, erred by not dismissing the charges or, at the very least, directing that a new trial be held; (2) the prosecution's misconduct relating to the withheld *Brady* and *Rosario* material requires a dismissal or a new trial; and (3) petitioner's burden at the evidentiary hearing did not extend to calling petitioner or the adversarial and potentially hostile former trial counsel. (Resp. Ex. 48 at ii.) Petitioner also claimed that his conviction in the Mobil station case should be reversed because the *Brady* and *Rosario* violations in the OTB case had a "prejudicial spillover effect" due to the consolidation of the OTB and Mobil cases. (*Id.* at 48-49.)

On December 23, 2008, the Appellate Division affirmed the County Court's decision denying the part of petitioner's motion seeking to vacate the judgment relating to the Mobil station crimes. *People v. Daly*, 57 A.D.3d 914, 914 (2d Dept. 2008). However, the Appellate Division found that a *Brady* violation had occurred, and granted petitioner a new trial on the counts relating to the OTB crimes. *Id.* at 914. The court also rejected petitioner's argument that "there was a prejudicial 'spillover effect' which warrants reversal of the convictions stemming from the Mobil gas station robbery." (*Id.* at 917.) The court held that "the undisclosed material pertained solely to the OTB robbery and the incidents were not factually related." (*Id.*)

i.  Appeal of the December 2008 Decision to the Court of Appeals

On August 20, 2009, petitioner appealed to the Court of Appeals, arguing that "the People's failure to turn over *Brady* and *Rosario* material involving the OTB robbery created a prejudicial spillover effect as to the Mobil attempted robbery." (Resp. Ex. 59.)

On May 4, 2010, the Court of Appeals rejected petitioner's arguments, holding that there was "no reasonable possibility that the *Rosario* and *Brady* violations had an impact on defendant's ability to defend against the gas station counts or otherwise influenced the verdicts on those counts." *People v. Daly*, 14 N.Y.3d 848, 850 (2010). Following this decision, petitioner did not seek certiorari review.

The District Attorney's Office opted to not retry petitioner on the charges relating to the OTB crimes, and those charges were dismissed. (Resp. Br.[9] at xxi.)

C.    The Instant Petition

Petitioner filed the instant habeas corpus petition on April 28, 2011. Respondent opposed on November 30, 2011. The Court has fully considered the arguments and submissions of the parties.

II.    STANDARD OF REVIEW

To determine whether a petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "'Clearly established Federal law'" is comprised of "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). Additionally,

_____

[9] "Resp. Br." refers to respondent's brief in opposition to the petition for writ of habeas corpus.

while "'[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact . . . are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

## III.  DISCUSSION

Petitioner has exhausted his claims in state court. The Court thus addresses the merits of his two claims for habeas relief.

### A.  Ineffective Assistance of Trial Counsel

Petitioner contends that he received ineffective assistance of trial counsel because his counsel failed to: (1) request a hearing pursuant to *People v. Darden*, 34 N.Y.2d 177 (1974); (2) obtain an expert in identification; (3) retain a ballistics expert; (4) present alibi witnesses; (5) call Michael Rose as a witness; (6) call character witnesses; (7) permit petitioner to take a lie detector test; (8) make certain objections to the prosecutor's direct examination of Bharaj Jr.; (9) move for a reduction in bail; (10) make a trial order of dismissal at the end of all the evidence; and (11) object to the portion of the judge's instructions to the jury concerning descriptions of the perpetrator provided by witnesses.[10] (*See*

critically at the facts by complimenting Judge DeRiggi during petitioner's case; (4) failed to attack the testimony of Megan Clement and her company; (5) waived petitioner's speedy trial rights without consent; (6) failed to inform petitioner about Terry Rogers following the black Cougar getaway car from the OTB robbery; (7) failed to emphasize the elimination of the gun owned by petitioner as having been used at the Mobil robbery; (8) engaged in a screaming and yelling match with petitioner; (9) voiced no objection to the Court in identification of petitioner by Shank; (10) used street vernacular; (11) presented his formal file to new counsel in poor condition; (12) failed to effectively communicate with petitioner and his family; (13) failed to visit the OTB crime scene or obtained crime scene photos; (14) failed to get bank statements to produce in evidence; (15) failed to adequately use police reports from the Hempstead Police and Ambulance crew that arrived at the Mobil after the robbery; (16) failed to have any plea discussions or offers regarding petitioner's cases; (17) failed to inquire about the reliability of a confidential informant under the *Aguilar-Spinelli* test; (18) failed to contest anything related to identification; (19) failed to follow through on the subpoena to secure petitioner's Home Depot receipts; (20) failed to adequately interview petitioner or apprise him of the law related to his case; (21) failed to effectively conduct direct and cross-examination; (22) discredited himself during his summation by stating that Daly had never previously been convicted; (23) failed to object to testimony concerning material not found at the crime scenes to show irrelevance; (24) failed to make a motion *in limine* to prevent evidence of Daly's drug usage from being brought out; (25) failed to tell Daly about Ryan; (26) failed to call Ryan as a witness or subpoena the wigs from his car; (27) failed to submit written requests to charge; and (28) failed to request a missing witness charge. (*See* Pet. at 6 and Resp. Ex. 21 at 32-36, 60-93, 94-98.) The Court has reviewed all of these claims and finds that trial counsel provided petitioner with effective representation, and there is no basis to conclude that counsel's performance fell below an objective standard of reasonableness for any of the reasons articulated by petitioner. In any event, even if trial counsel's performance was deficient, petitioner suffered no prejudice as a result of any of these purported errors by counsel because the evidence against him on the Mobil robbery was overwhelming, and there is no reasonable probability that, but for any of these (or any other) purported errors by counsel the outcome of the trial would have been different.

---

[10] Petitioner also claims that trial counsel: (1) was distracted during the trial by his ill wife; (2) gratuitously praised his adversary and the Nassau County Police Department; (3) deprived the jurors of an adversarial proceeding or the responsibility to look

Pet.[11] at 6, Resp. Ex. 21[12] at 32-36, 60-93, 94-98.) The Appellate Division concluded that petitioner was not deprived of effective assistance of counsel because trial counsel presented a coherent and cogent defense. *People v. Daly*, 20 A.D.3d at 543. As set forth herein, the record as a whole demonstrates that petitioner received effective representation, and the Appellate Division's decision on that issue was neither contrary to, nor based on an unreasonable application of, clearly established federal law. Therefore, the Court concludes that the claim for habeas relief based on ineffective assistance of counsel fails on the merits.

1. Legal Standard

Under the standard promulgated in *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

The first prong requires a showing that counsel's performance was deficient. However, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005)

(quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of trial counsel's actions under all circumstances, keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Id.* at 319 (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)) (internal quotation marks omitted). In assessing performance, a court must apply a "'heavy measure of deference to counsel's judgments.'" *Id.* at 319 (quoting *Strickland*, 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," *DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996), and "'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,'" *id.* (quoting *Strickland*, 466 U.S. at 690). Moreover, "'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* at 588 (quoting *Strickland*, 466 U.S. at 690-91).

The second prong focuses on prejudice to a petitioner. A petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that it "undermine[s] confidence in the outcome." *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting

---

[11] "Pet." refers to the petition for habeas corpus.

[12] Petitioner does not present any new arguments in support of his petition for habeas corpus. For his ineffective assistance of counsel argument, he merely refers to points 1, 4 and 5 his brief on direct appeal which is reproduced in respondent's Exhibit 21.

guilt." *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of *Strickland*, the determination of prejudice 'may be made with the benefit of hindsight.'" *Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007) (quoting *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994)).

This Court proceeds to examine petitioner's claim, keeping in mind that petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004).

## 2. Application

### a. Failure to Request a *Darden* Hearing

Petitioner alleges that trial counsel was ineffective for failing to request a hearing pursuant to *People v. Darden*, 34 N.Y.2d 177 (1974). This claim lacks merit because there was no legal basis for a *Darden* hearing. A *Darden* hearing is used to challenge the actual existence and reliability of any confidential informer who provided information that served as the basis for probable cause for a defendant's arrest. *Darden*, 34 N.Y.2d at 180. A defendant is entitled to such a hearing only when information is provided by a confidential informant. *Id.* at 179-82. Here, petitioner's arrest was based on his identification as the perpetrator of the OTB and Mobil crimes by Shank and Bharaj Jr., who were not confidential informants. (Resp. Ex. 62 at 2-21.) Shank and Bharaj Jr. both testified at trial and made no attempts to conceal their identities at any point during the course of petitioner's arrest or the trial proceedings. Thus, because petitioner never had a legal entitlement to a *Darden* hearing, he fails to satisfy the first prong of *Strickland*.

### b. Failure to Call an Identification Expert

Petitioner asserts that trial counsel was ineffective for failing to obtain an expert to question or explain the identification process. (Pet. at 6, Resp. Ex. 21 at 35.) This assertion is unfounded because an expert on identification would have been unnecessary.

Petitioner claims that counsel was "not aware of changes in the law that allowed for such testimony" from an expert in identification. Petitioner cites *People v. Lee*, 96 N.Y.2d 157 (2001), a case decided the same year as petitioner's trial. In *Lee*, the Court of Appeals held that expert testimony on the issue of the reliability of eyewitness identification "is not inadmissible per se" and that "the decision whether to admit it rests in the sound discretion of the trial court." 96 N.Y.2d at 160. Petitioner's interpretation of *Lee* as setting forth a compulsory requirement for attorneys distorts the nature of the court's holding. *Lee* does not mandate that attorneys must obtain the services of an expert in identification in every case involving identification issues in order to avoid being deemed incompetent.

Peace presented a claim of misidentification without the use of an expert in identification. He determined that *Lee* would not have been advantageous because expert testimony would have been repetitive. (Resp. Ex. 6 at 5.) He also believed that "jurors are turned off by most so-called expert witnesses" and felt that using an expert would have been an added distraction because there was ample other evidence available to attack the

identification testimony. (*Id.*) This conclusion was not unreasonable. Therefore, the Court concludes that petitioner fails to show deficient performance.

c. Failure to Retain a Ballistics Expert

Petitioner argues that trial counsel's failure to retain a ballistics expert rendered him ineffective. (Pet. at 6, Ex. 21 at 75-76.) Counsel's strategic choice to not retain a ballistics expert, however, was objectively reasonable. According to Peace's affirmation, he considered using a ballistics expert. (Resp. Ex. 6 at 3.) He submitted the People's ballistics report to an independent ballistics expert, obtained his opinion, and declined to pursue this strategy. (*Id.*) The expert would not have been able to make the positive statement that the gun used in the Mobil robbery was not the gun recovered from petitioner's home. (*Id.*) Therefore, counsel saw no use for the expert's testimony, stating that it would only have distracted the jury from petitioner's specific defenses. (*Id.*)

An attorney's duty to investigate is limited to "mak[ing] reasonable investigations or to mak[ing] a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* Here, the ballistics expert retained by the defense would not have been able to state that the People's expert was wrong and could not have provided further opinions without performing tests on the guns himself. (Resp. Ex. 6 at 3.) Counsel also reasonably concluded that further testing would have been unnecessary because the defense's theory of the case was that Rooney used petitioner's gun to commit the crimes. (*Id.*) Moreover, there is no proof

that further testing would have produced any helpful evidence for the defense. Therefore, petitioner has not demonstrated that counsel's representation fell below an objective standard of reasonableness.

d. Failure to Present Alibi Witnesses

Petitioner contends that trial counsel was ineffective for failing to present alibi witnesses. (Pet. at 6, Ex. 21 at 34, 83.) This claim fails, as counsel's actions were objectively reasonable.

The decision to call, or not call, a witness is a classic example of strategy. With respect to alibi witnesses, courts have found that "even if . . . alibi evidence did exist, the trial attorney's decision not to call the purported alibi witnesses was a reasonable tactical decision" that does not constitute deficient performance. *Dupont v. United States*, 224 F. App'x 80, 81 (2d Cir. 2007); *see also Perkins v. Comm'r of Corr. Servs.*, 218 F. App'x 24, 26 (2d Cir. 2007) (finding valid "strategic reasons" for failure to call alibi witnesses).

Petitioner argues that there were three eyewitnesses who saw petitioner at his home on February 26, 2001, and should have been called as alibi witnesses. (Resp. Ex. 21 at 83.) However, counsel made a strategic decision to not call alibi witnesses because he determined that these witnesses would have added nothing to the defense. (Resp. Ex. 6 at 9.) The witnesses, who were friends and neighbors of petitioner's family, all stated that at the time they saw petitioner, they also saw Rooney with him. (*Id.*) Thus, counsel concluded that it would be futile to call a witness who would be an alibi for the man whom the defense believed actually committed the crime charged to petitioner. (*Id.*) Furthermore, the testimony of these alibi witnesses could have been damaging to the defense because it conflicted with the testimony of the detectives who were

watching petitioner's house on February 26, 2001, as well as petitioner's own testimony. The statements of Eleanor Cappiello and Ken Johnson indicated that they both saw petitioner and Rooney outside petitioner's home on February 26, 2001 around 10:20 a.m. (Resp. Ex. 23 at A76-79, A82-83.) These statements are contradictory to the petitioner's testimony that he spoke with Rooney in his driveway around 10:00 a.m. and then returned inside his house until the time of his arrest. (Tr. at 764-65.) Because the alibi witness testimony was contradictory and may have undermined the defense theory that Rooney committed these crimes, it was reasonable for counsel to decline to call the alibi witnesses.

Therefore, petitioner has not satisfied the first prong of *Strickland* because counsel's determination to not call alibi witnesses is not objectively unreasonable. The decision to choose one consistent defense is the kind of strategic decision entrusted to counsel.

### e.    Failure to Call Michael Rose as a Witness

Petitioner asserts that trial counsel was ineffective for failing to call Michael Rose ("Rose") as a witness. (Pet. at 6, Ex. 21 at 83.) Rose lives adjacent to the Mobile Gas Station. (Resp. Ex. 23 at A80.) Petitioner asserts that "these omissions by [counsel] caused John Daly to be wrongfully convicted" because Rose would have testified that "he had a clear view of the gas station from his window; that he was looking out of his window during the robbery; that there was no struggle; and that he was unable to identify the assailant since he was wearing a mask that covered his face." (Resp. Ex. 21 at 83.)

"Courts applying *Strickland* are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury. . . 'The decision not to call a

particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess.'" *Greiner v. Wells,* 417 F.3d 305, 323 (2d Cir. 2005) (quoting *United States v. Luciano,* 158 F.3d 655, 660 (2d Cir. 1998)); *see also Eze v. Senkowski,* 321 F.3d 110, 129 (2d Cir. 2003) ("A defense counsel's decision not to call a particular witness usually falls under the realm of trial strategy that we are reluctant to disturb."). In fact, depending on the circumstances, even counsel's decision not to call witnesses "that might offer exculpatory evidence . . . is ordinarily not viewed as a lapse in professional representation." *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000).

According to Rose, he saw a chase and heard a shot, but the shooter's back was to him so he would not be able to identify the shooter. (Resp. Ex. 23 at A80-81.) According to Peace, this description of Rose's observations of the perpetrator was nearly identical to those given by other eyewitnesses to the shooting. (Resp. Ex. 6 at 7.) Counsel deduced that Rose would be unable to offer anything additional to the defense that other witnesses could not provide. (*Id.*) Moreover, petitioner indicated that Rose's testimony would have contradicted the testimony of the Bharajs because Rose did not witness a struggle between the shooter and the victim. (Resp. Ex. 21 at 83.) However, the Bharajs never testified that there was any struggle between themselves and the shooter. (Tr. at 386-425, 481-506.) Counsel's decision to not call Rose as a witness thus was objectively reasonable because Rose's testimony would not have advanced the defense in any significant way. The inclusion of Rose as a witness may have actually been harmful to petitioner's case. Thus, petitioner failed to satisfy the first prong of *Strickland*.

### f.    Failure to Call Character Witnesses

Petitioner claims that trial counsel was ineffective for failing to call character witnesses. (Pet. at 6, Ex. 21 at 85.) The Court disagrees. As stated *supra*, a defense attorney's decision to call or not call witnesses is a recognized component of trial strategy to which courts give great deference. Here, counsel acted reasonably in declining to call character witnesses because it would have been a risky tactic. (Resp. Ex. 6 at 2.) Peace deduced that, on cross-examination, such witnesses would reveal uncharged robberies committed by petitioner as well as petitioner's history of drug abuse. (*Id.*) This information could have devastated the defense and counsel determined that the potential harm of putting on character witnesses would have outweighed any possible benefit. (*Id.*) Thus, the decision not to call character witnesses stemmed from a desire to avoid any negative impact resulting from information about petitioner's past that would be revealed to the jury by the witnesses, and may be characterized as "sound trial strategy." *Strickland,* 466 U.S. at 689-90. Therefore, petitioner's claim fails because the decision to not call character witnesses was objectively reasonable.

### g.     Failure to Permit Petitioner to Take a Lie Detector Test

Petitioner claims that he was denied effective assistance of trial counsel because counsel would not permit petitioner to take a lie detector test. (Pet. at 6, Ex. 21 at 60-61.) The Court disagrees. Petitioner claims that he repeatedly asked counsel for a lie detector test to use the results for plea discussions and to boost his confidence during the trial. (Resp. Ex. 6 at 6, Resp. Ex. 21 at 61.) However, counsel stated that petitioner asked about a lie detector test on only one occasion and counsel informed him that the results would be useless because they would not aid in plea discussions and were inadmissible at trial. (*Id.*) Counsel's

statement is consistent with New York law. *E.g.*, *People v. De Lorenzo*, 45 A.D.3d 1402, 1403 (N.Y. App. Div. 2007) ("It is well established that 'the reliability of the polygraph has not been demonstrated with sufficient certainty' for the results of such tests to be admissible in evidence." (quoting *People v. Shedrick*, 66 N.Y.2d 1015, 1018 (1985) and citing cases); *see also United States v. Ruggiero*, 100 F.3d 284, 292 (2d Cir. 1996) (confirming that lie-detector tests are generally not admissible in federal court because of their questionable accuracy). Further, petitioner's assumption that the results of the test would be favorable and that these results could have led to a more favorable verdict was merely speculation. Despite petitioner's claim that counsel's actions were "incomprehensible," counsel's decision to tell petitioner not to take a lie detector test was legally sound advice. Therefore, petitioner's claim fails because it does not satisfy the first prong of *Strickland*.

### h.     Failure to Make Certain Objections to the Direct Examination of Bharaj Jr.

Petitioner asserts that trial counsel was ineffective because he failed to make certain objections to the prosecutor's direct examination of Bharaj Jr. (Pet. at 6, Ex. 21 at 68.) This claim is unfounded because such objections would have been unnecessary.

In particular, "[a]ctions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." *Best*, 219 F.3d at 201 (quoting *Strickland*, 466 U.S. at 689); *see also Lynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006) ("As a general rule, a *habeas* petitioner will be able to demonstrate that trial counsel's decisions were objectively unreasonable only if there [was] no . . . tactical justification for the course taken.") (citation and quotation marks omitted). For that reason, "[s]trategic choices made by counsel

after thorough investigation . . . are virtually unchallengeable . . . and there is a strong presumption that counsel's performance falls 'within the wide range of reasonable professional assistance.'" *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 689-90); *see also Pavel v. Hollins*, 261 F.3d 210, 2l6 (2d Cir. 2001) (explaining that representation is deficient only if, "in light of all the circumstances, the identified acts or omissions were outside the *wide* range of professionally competent assistance") (emphasis in original) (citation and quotation marks omitted).

Petitioner claims that counsel should have objected when the prosecutor asked Bharaj Jr., "Did you see where the defendant went after you went to the ground?" (Resp. Ex. 21 at 68, Tr. at 402.) However, it was proper for the prosecutor to refer to petitioner as "defendant," rather than "the shooter," because the witness had already identified petitioner as the perpetrator. (Tr. at 396-97.) Petitioner also complains that counsel failed to object when Bharaj Jr. testified about his surgery and recovery from the shooting at the Mobil station. (Resp. Ex. 21 at 68, Tr. at 404-07.) However, counsel contended that no objection could have been made to this testimony since there was a charge of attempted murder and a charge of first degree assault which would have permitted such testimony regarding the extent of the injury suffered by Bharaj Jr. (Resp. Ex. 6 at 6.) Counsel's failure to object to Bharaj Jr.'s testimony was reasonable and petitioner's claim is therefore groundless.

i.     Failure to Move for a Reduction in Bail

Petitioner argues that trial counsel was ineffective for failing to move for a reduction in bail. (Pet. at 6, Ex. 21 at 61)

However, this claim is completely meritless because trial counsel sought a reduction of bail on September 27, 2001, although that motion was denied. (Resp. Ex. 65.)

j.     Failure to Make a Trial Order of Dismissal at the End of All the Evidence

Petitioner claims that counsel was ineffective because he failed to make a trial order of dismissal at the end of all the evidence. (Pet. at 6, Ex. 21 at 69.) As set forth below, this claim is without merit.

Petitioner claims that counsel "retreated" in the presence of the jury when counsel stated, "A motion to dismiss because of the evidence taken in the light most favorable to the People could not result in a conviction would be absurd. I don't make absurd motions. This is a triable case to the jury." (Resp. Ex. 21 at 69, Tr. at 871.) Petitioner also accused counsel of acting as an agent for the prosecution, rather than an advocate for his client. (*Id.*) However, petitioner's accusation that counsel made this statement in front of the jury is false. The record clearly states that the "discussion was held at the bench off the record" and, therefore, was never heard by the jury. (Tr. at 871.)

Moreover, counsel's conclusion that a trial order of dismissal would be absurd was reasonable given the legal standard requiring that the evidence be considered in the light most favorable to the prosecution. (Tr. at 871.) Attorneys are not required to make meritless motions. *See Buitrago v. Scully*, 705 F. Supp. 952, 954 (S.D.N.Y. 1989). Thus, decisions to forego meritless motions cannot be grounds for claims of ineffective assistance of counsel. Here, such a motion would likely have been meritless because of the overwhelming evidence against petitioner. Counsel recognized this lack of merit, as he stated, "I will never make a motion for a trial order of dismissal that I know to be frivolous. I will never argue

when I know there is no merit to my argument." (Resp. Ex. 6 at 3.) In short, petitioner has not satisfied the first prong of *Strickland* because he is unable to demonstrate that counsel's performance fell below an objective level of reasonableness.

### k. Failure to Object to the Judge's Instructions to the Jury Concerning Descriptions of the Perpetrator Provided by Witnesses

Petitioner argues that trial counsel was ineffective for failing to object to the portion of the judge's instructions to the jury concerning descriptions of the perpetrator provided by witnesses. (Pet. at 6, Ex. 21 at 94-96.) Petitioner's claim fails because such an objection would have been without merit.

The judge instructed the jury, "You will also recall that the descriptions of the perpetrator were given to the police shortly after the commission of the crimes. You may not consider such evidence in deciding whether the right man or wrong man is on trial in this case." (Tr. at 1000.) This instruction is not objectionable under New York law, under which testimony concerning descriptions given out of court is hearsay and is not admissible to establish the truth of what was stated. *See People v. Huertas*, 75 N.Y.2d 487, 491-93 (1990). This type of evidence can only be admitted for "nonhearsay purpose[s]" such as "assist[ing] the jury in evaluating the witness's opportunity to observe at the time of the crime, and the reliability of her memory at the time of the corporeal identification." *People v. Huertas*, 75 N.Y.2d at 493; *accord People v. Wilder*, 93 N.Y.2d 352, 357 (1999). Thus, counsel cannot be criticized for failing to object to the instruction because the instruction was consistent with prevailing state law.

Although petitioner failed to show that counsel's actions were unreasonable, the Court finds that, assuming *arguendo* that counsel's performance was deficient, counsel's failure to object to the instruction did not result in prejudice to petitioner. Immediately after giving the instruction at issue, the Court clearly instructed the jury to consider the descriptions given to the police shortly after the crime and compare them to the physical appearance of petitioner to determine whether the witnesses had "the opportunity or mental capacity to reason at the time and to remember the physical features and other characteristics of the perpetrator." (Tr. at 1000-01.) This additional instruction was intended to avoid prejudice to petitioner because it allowed the jury to consider the defense theory that the identification testimony was not credible due to inconsistencies between the witnesses' descriptions and petitioner's actual appearance. Thus, petitioner failed to demonstrate that counsel's failure to object to the instruction was unreasonable, or that he was prejudiced by the alleged error.

### l. Prejudice to Petitioner

Even assuming *arguendo* that counsel's performance was deficient in any of the above respects, the Court concludes that none of these failures, alone or in concert, resulted in prejudice to petitioner. "In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the 'cumulative weight of error' in order to determine whether the prejudice 'reache[s] the constitutional threshold.'" *Somerville v. Conway*, 281 F. Supp. 2d 515, 519 (E.D.N.Y 2003) (quoting *Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir. 2001)). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Given the record detailed *supra*, there is no reasonable

probability that petitioner would have been acquitted but for these failures. The evidence establishing petitioner's guilt as to the Mobile Gas Station incident is overwhelming. Further, trial counsel pursued a sound strategy of misidentification, focusing on Rooney. Petitioner's contention that he would not have been convicted is speculative at best and fails to satisfy the second prong of *Strickland*.

In sum, the Court finds that petitioner has failed to show that any aspect of his trial counsel's performance, individually or collectively, fell "outside the wide range of professionally competent assistance" or that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 690. Given the record in this case, the Court concludes that the state court's decision to deny petitioner's ineffective assistance claim under *Strickland* did not "involve[] an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Nor did it involve "an unreasonable determination of the facts in the light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Therefore, the Court rejects petitioner's claim of habeas relief based on ineffective assistance of counsel.

### B. Prejudicial Spillover

Petitioner claims that the *Brady* violation associated with the January 2001 OTB robbery had a prejudicial spillover effect on the jointly tried February 2001 Mobil Gas Station crimes, and that this warrants habeas relief. (*See* Pet. at 6,[13] Resp. Ex. 48.)

As a threshold matter, a petitioner is entitled to a writ of habeas corpus only when the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added). There is no specific Supreme Court authority with respect to "spillover" prejudice when a criminal count has been dismissed at trial or reversed on appeal. In fact, the Supreme Court recently was presented with the opportunity to rule on a prejudicial spillover claim, but did not need to address it. *See Black v. United States*, 130 S. Ct. 2963, 2970 n.14 (2010) ("Black contends that spillover prejudice from evidence introduced on the mail-fraud counts requires reversal of his obstruction-of-justice conviction. . . That question, too, is one on which we express no opinion."). Therefore, some courts have held that "it would be impossible for this Court to determine that" a prejudicial spillover claim implicates "clearly established federal law" and thus, a prejudicial spillover claim cannot be a ground for habeas relief. *See Couser v. Zon*, No. 05-CV-1040, 2008 WL 2440709, at *6 (N.D.N.Y. June 17, 2008); *see also Woods v. Lempke*, No. 08CV144, 2008 WL 5157286, at *3 (W.D.N.Y. Dec. 8, 2008) ("Petitioner fails to provide any established federal law as determined by the Supreme Court that acknowledged a claim of 'spillover' effect a reversed conviction on one count having on other counts of conviction.").

---

[13] Petitioner does not make new arguments for his prejudicial spillover claim and instead refers to his brief on appeal from the second § 440.10 decision.

The Second Circuit, however, has developed a framework for addressing prejudicial spillover claims in this context, which is referred to as "retroactive misjoinder." *See, e.g.*, *United States v. Jones*, 482 F.3d 60, 78 (2d Cir. 2006) ("Retroactive misjoinder refers to circumstances in which the joinder of multiple counts was proper initially, but later developments—such as a district court's dismissal of some counts for lack of evidence or an appellate court's reversal of less than all convictions—render the initial joinder improper." (internal quotation marks and brackets omitted)); *see also United States v. Simels*, 654 F.3d 161, 171 (2d Cir. 2011) ("Nor is a retrial on the remaining counts required, as Simel contends, on a theory of retroactive misjoinder because of prejudicial spillover from evidence introduced on the vacated counts. The Appellant has not met the 'extremely heavy burden' of demonstrating that there was prejudicial spillover necessitating a new trial." (citation omitted)).

Moreover, although not explicitly addressing the "clearly established federal law" requirement, the Second Circuit has addressed the merits of prejudicial spillover or retroactive misjoinder claims in the context of habeas petitions. *See Lindstadt v. Keane*, 239 F.3d 191, 206 (2d Cir. 2001) (after granting habeas relief for ineffective assistance of counsel on four counts of child abuse related to one incident, concluding that habeas relief was warranted on count relating to a second incident based on spillover because jury that finds guilt on abuse counts on one occasion is "primed to find the defendant guilty of another," there was less evidence to support fifth count and it was "infected by the same errors affecting the other counts," and count was "the weakest of the lot"); *Herring v. Meachum*, 11 F.3d 374, 378 (2d Cir. 1993) ("Moreover, because the evidence with respect to each

murder was distinct and easily compartmentalized, the risk of jury confusion at petitioner's trial was significantly limited."); *see also Jelinek v. Costello*, 247 F. Supp. 2d 212, 276-77 (E.D.N.Y. 2003) (citing *United States v. Morales*, 185 F.3d 74, 82 (2d Cir. 1999)) (applying Second Circuit procedure for assessing prejudicial spillover claim).[14] Thus, it appears that the Second Circuit has implicitly concluded that, because the prejudicial spillover rule is clearly established in a set of facts involving joinder, *see, e.g.*, *Zafiro v. United States*, 506 U.S. 534 (1993); *United States v. Lane*, 474 U.S. 438 (1986), it also is clearly established in the context of a set of facts involving retroactive misjoinder. *Accord Panetti v. Quarterman*, 551 U.S. 930 (2007) ("AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute recognizes that, to the contrary, that even a general standard may be applied in an unreasonable manner." (internal quotation marks and citations omitted)).

Accordingly, this Court, following the Second Circuit's decisions in the habeas context, treats the retroactive misjoinder rule to be clearly established and, thus, considers the merits of the spillover effect claim. As set forth below, the Court concludes, under this Circuit's precedent, that petitioner has failed to demonstrate that

---

[14] This is not the only circuit to address prejudicial spillover claims on habeas corpus review. For example, the Ninth Circuit has concluded that where evidence was simple and distinct, it was "likely that the jury was able to keep the evidence separate when considering the various counts." *Bean v. Calderon*, 163 F.3d 1073, 1091 (9th Cir. 1998).

there was a prejudicial spillover resulting from the vacated OTB convictions.

### 1. Legal Standard

When fewer than all criminal counts have been dismissed at trial or reversed on appeal, a court must determine whether prejudicial spillover from evidence introduced in support of the dismissed or reversed counts requires the remaining convictions to be upset. *Jelinek*, 247 F. Supp. 2d at 276 (citing *United States v. Rooney*, 37 F.3d 847, 855 (2d Cir. 1994)). In assessing the "spillover effect" on the remaining counts, reviewing courts consider "whether the totality of the circumstances requires reversal of some or all of the remaining counts." *United States v. Wapnick*, 60 F.3d 948, 953 (2d Cir. 1995) (quotation omitted).

Three factors guide the impermissible spillover inquiry:

> 1) whether the evidence on the vacated counts was inflammatory and tended to incite or arouse the jury to convict the defendant on the remaining counts; 2) whether the evidence on the vacated counts was similar to or distinct from that required to prove the remaining counts; and 3) the strength of the government's case on the remaining counts.

*United States v. Naiman*, 211 F.3d 40, 50 (2d Cir. 2000).

The first factor is not met where "the evidence that the government presented on the reversed counts was, as a general matter, no more inflammatory than the evidence that it presented on the remaining counts." *Morales*, 185 F.3d at 83. With respect to the second factor, the Second Circuit has explained that, as a practical matter, it can be difficult for a defendant to make a showing of prejudicial spillover when the evidence introduced in support of the vacated and remaining counts emanate from similar facts (because the same evidence would likely have been admissible to prove both) or where the vacated and remaining counts are premised on completely different fact patterns (since the evidence to both counts is readily separable). *Morales*, 185 F.3d at 82; *accord Wapnick*, 60 F.3d at 954; *see also Rooney*, 37 F.3d at 856 ("[T]he absence of prejudicial spillover can also be found where the evidence on the reversed and remaining counts are completely dissimilar, thus permitting the inference that the jurors were able to keep the evidence separate in their minds."). "Thus, a defendant is likely to make a successful argument of prejudicial spillover only in those cases in which evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, and this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts." 185 F.3d at 82 (quotation omitted). For the third factor, a claim of prejudicial spillover will likely fail when the government's case is "sufficiently strong so that there was little or no likelihood that any prejudice from the structuring charge tainted the jury's verdicts on the remaining charges." *Wapnick*, 60 F.3d at 954.

"In New York, the 'paramount consideration in assessing potential spillover error is whether there is a reasonable possibility that the jury's decision to convict on the tainted counts influenced its guilty verdict on the remaining counts in a meaningful way.'" *Jelinek*, 247 F. Supp. 2d at 277 (quoting *People v. Doshi*, 715 N.E.2d 113, 116 (1999)).

### 2. Application

First, as discussed *supra*, the evidence presented for the vacated OTB charges was no more inflammatory than that for the Mobil charges. For the OTB charges, the government presented evidence that petitioner robbed three cashiers and shot a man in the stomach. For the Mobil charges, the government presented evidence that petitioner attempted to rob gas station and shot a man in the stomach. The evidence from the two incidents depicted the crimes as being of the same nature and quality. Thus, the evidence from the OTB charges could not have incited the jury to convict on the Mobil charges. There also is no colorable argument that the conduct at issue is comparable to the child abuse addressed in *Lindstadt*. Petitioner, therefore, fails to satisfy the first factor.

Second, in this case, the indictment stated, "All of the acts and transactions alleged in each of the several counts of this Indictment are connected together and form part of a common scheme and plan." (Ex. 1 at 4.) Petitioner cites this to support his argument that this was "the People's battle cry throughout the course of the trial." (Pet. Supp.[15] at 1.) Petitioner also argues that the crimes were intertwined through the alternate presentment of witness testimony, the police lineup which involved both sets of victims, and the opinions of the expert witnesses about both incidents which were simultaneously expressed during trial. (*Id.*) However, the indictment was never read to the jury or introduced into evidence. (Resp. Br. at 56.) Thus, because the jury never heard this statement, it could not have affected the deliberations. This wording alone does not prove that the prosecutor did, in fact, present the two crimes as part of a common scheme and plan.

Moreover, it is clear that the vacated and remaining counts originated from dissimilar facts. The two incidents occurred in different venues, on different dates, and in different locations at different times. (Tr. at 346-47, 427-29.) The perpetrator was also described as wearing different disguises during the two incidents. (Tr. at 340-51, 431-32, 486.) In addition, none of the eyewitnesses or victims from the OTB incident was an eyewitness or victim from the Mobil incident. Further, in this case, there were only two significant sources of overlapping evidence and facts between the incidents. First, the ballistics evidence suggested that the same gun was used for both crimes. However, this evidence was not conclusive with regard to the OTB incident. Second, the methodology of the two crimes was similar, as the perpetrator shot a man in the stomach in the course of a robbery on both occasions. Under New York law, however, this is not enough to demonstrate that the crimes were presented as part of a common scheme and plan. *See People v. Fiore*, 34 N.Y.2d 81, 84-85 (1974) (noting that showing a "[m]ere similarity" between two crimes is insufficient to demonstrate that the acts were conducted as part of a common scheme and plan."). To show that two acts were conducted as part of a common scheme and plan, "[t]here must be such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." *Id.* at 85 (internal citation and quotation marks omitted). As stated *supra*, the circumstances surrounding the reversed and the remaining counts were distinct. Thus, it is a reasonable inference that the jurors were able to keep the evidence separate in their minds. Accordingly, petitioner has failed to satisfy the second factor. The two incidents were not factually intertwined to such a degree

---

[15] "Pet. Supp." refers to the three page document petitioner attached to his petition for habeas corpus.

that the *Brady* violation relating to the OTB counts required reversal of the Mobil counts.

Third, the evidence establishing petitioner's guilt on the Mobil counts was overwhelming. The government's case included testimony from three reliable eyewitnesses who identified petitioner as the perpetrator. (Tr. at 405-06, 441-43, 490.) It also included identification of petitioner's automobile by the eyewitnesses and the detectives. (Tr. at 437-38, 487-88, 474, 456-59.) In addition, the government offered ballistics evidence that conclusively matched the gun used in the Mobil crime to a gun registered to petitioner and found in petitioner's home. (Tr. at 715-22.) Further, detectives recovered items from petitioner's home that matched eyewitness descriptions of the clothing worn by the Mobil perpetrator, and one of these items contained petitioner's DNA. (Tr. at 407-08, 431-32, 486, 529-31, 622-23.) Thus, the strength of the government's case on the Mobil robbery was overwhelming, and there was no likelihood that any prejudice from the OTB counts could have tainted the jury's verdict on the Mobil station counts.

Therefore, the Court concludes that petitioner has failed to demonstrate a prejudicial spillover effect from the admission of the evidence regarding the OTB robbery. Accordingly, the Court denies the claim for habeas relief based on prejudicial spillover.

## IV. CONCLUSION

For the reasons set forth herein, the Court concludes that petitioner has demonstrated no basis for habeas relief under 28 U.S.C. § 2254. Therefore, the petition for a writ of habeas corpus is denied in its entirety on the merits. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue.

*See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 4, 2014
       Central Islip, New York

\* \* \*

Petitioner is proceeding *pro se*. Respondent is represented by Andria M. DiGregorio, Nassau County District Attorney, 262 Old Country Road, Mineola, NY 11501.